# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| IN RE XUNLEI LIMITED SECURITIES LITIGATION | Civil Action No. 1:18-cv-00467-RJS<br><br>**DECLARATION OF HUI (ROBIN) HUANG, PH.D., LLM, LLB IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** |

I, Hui (Robin) Huang, Ph.D., LLM, LLB, under 28 U.S.C. § 1746, declare as follows:

## I.     INTRODUCTION AND BACKGROUND

1.      I am a Professor of Law and Assistant Dean (External Affairs-Asia) at the Chinese University of Hong Kong, where I teach courses on, *inter alia*, Hong Kong Securities Regulation, Chinese Securities Regulation, Chinese Company Law, and Capital Markets Law in Asia.  I received two bachelor's degrees—in mechanical engineering and law—and a master's degree in law, from Tsinghua University in Beijing, where I graduated first in my class.  I also received a Ph.D. from the Faculty of Law at the University of New South Wales in Sydney.

2.      I have authored over 60 peer-reviewed academic journal articles, many of which relate to financial regulation in Hong Kong or the People's Republic of China (PRC).  I am the author of several textbooks including *Securities and Capital Markets Law in China* (UK, Oxford University Press, 2014), the first English textbook to provide a comprehensive and contextualized account of Chinese securities and capital markets law.  I have recently published several articles on financial technology in China, including "Online P2P Lending and Regulatory Responses in China: Opportunities and Challenges" (2018) 19 European Business Organization Law Review 63-92, and will soon publish an article specifically on the issue of initial coin

offerings (ICO), namely, "The Regulation of Initial Coin Offerings in China," European

Business Organization Law Review (2018, forthcoming) (with Hui Deng, Qingran Wu).

3.      I have served as an expert consultant to multiple governmental agencies in the

field of financial regulation, including the Hong Kong Securities and Futures Commission, the

Hong Kong Securities Institute, China Banking Law Society, the Supreme People's Court of

PRC, and the U.S. Securities and Exchange Commission.  I have held visiting posts at

prestigious institutions such as Harvard Law School, Columbia Law School, Oxford Law

School, Cambridge Law School, and McGill Law School.  I am also a guest professor at several

Chinese universities, including the China University of Political Science and Law, East China

University of Political Science and Law, and Jinan University.

4.      Attached as Exhibit A to this declaration is a true and correct copy of my CV.

## II.      SCOPE AND SUMMARY OF OPINIONS

5.      I have been asked by O'Melveny & Myers LLP, counsel for the defendants in this

matter, to provide an expert report addressing: (i) whether the OneThing Cloud and the

OneThing Cloud Reward Program ("Rewards Program") constitute an ICO, and (ii) whether they

violate Chinese laws and regulations.

6.      It is my opinion that the OneThing Cloud and the Rewards Program do not

constitute an ICO and do not violate Chinese laws and regulations.  In reaching my opinion, I

relied on publicly available information on the OneThing Cloud and the Rewards Program.

7.      I confirm that I have no present or past business or personal relationship with any

of the parties to this litigation or their legal advisors (other than in connection with this report).  I

confirm that I am independent from the parties and their legal advisors.  I confirm that I have not

entered into any arrangement where the amount or payment of my fees is in any way dependent

on the outcome of my opinions or the case.

8.      I will advise counsel for defendants, who have retained me in this matter, if, between the date of my report and the hearing, there is any change in circumstances that affects my statements in Paragraph 7 above.  I will notify counsel for defendants immediately and confirm in writing if, for any reason, my existing report requires any correction or qualification.

## III.   THE RELEVANT LEGAL AND REGULATORY LANDSCAPE IN CHINA

### A.   The Chinese Government Directive Regarding ICOs

9.      On 4 September 2017, the People's Bank of China (PBOC), which is the central bank in China, along with six ministries, collectively issued the *Public Notice on Preventing Risks of Fundraising through Coin Offering* ("2017 ICO Notice").

10.     Article 1 of the 2017 ICO Notice states that

> Financing through coin offerings refer to financing bodies raising virtual currencies such as Bitcoin or Ethereum from investors through illegal sales and circulation of crypto currency or tokens. Such offerings, in essence, are unauthorized and illegal public fundraising and are suspected of involving in criminal activities such as illegal selling of tokens, illegal issuance of securities, illegal fundraising, financial fraud and pyramid schemes.

11.     Article 2 of the 2017 ICO Notice prohibits organizations or individuals from illegally conducting ICO financing activities.

12.     Although the 2017 ICO Notice clearly bans ICOs in China, it is not fully clear what amounts to an ICO.  As noted above, Article 1 of the 2017 ICO Notice refers to "illegal sales and circulation of crypto currency or tokens," which suggests that the sale and circulation of crypto currency or tokens can be either legal or illegal, depending on the particular circumstances of each case.

13.     In fact, two days before the promulgation of the 2017 ICO Notice, on 2

September, the Internet Financial Risk Special Rectification Work Leading Group Office[1] issued

the *Notification Concerning the Undertaking of Clean-up and Rectification Work for ICO*

("Notification No. 99").  Article 1 of the 2017 ICO Notice has its origin in this document, which

defines ICO as "unauthorized and illegal public fundraising" suspected of involving "illegal

fundraising, illegal securities offerings, illegal sale of virtual currencies . . . as well as other

illegal criminal activities such as financial fraud and pyramid selling that severely disrupt the

economic and financial order."

      14.     Due to the lack of clarity over the definition of ICO, Notification No. 99 states

that rectification will be carried out with respect to ICOs on a case-by-case basis.

      15.     Under Article 1 of the 2017 ICO Notice, the "illegal" sale of crypto currency or

tokens is in nature "unauthorized and illegal public fundraising."  Hence, if a sale of crypto

currency or tokens is not a form of "public fundraising," then it may be as legal as with any other

ordinary transaction, and may not be classified as an ICO.  Article 1 of the 2017 ICO Notice

provides more guidance on the illegality of ICOs, stating that an ICO may constitute "illegal

issuance of securities" or "illegal fundraising" more generally in China.

### B.     Other Relevant Chinese Laws Related to ICOs

      16.     What amounts to the "illegal issuance of securities" must be determined by

reference to the Securities Law of the People's Republic of China as amended in 2014

("Securities Law").

      17.     In order to issue securities in China, the issuer is required to apply for approval

---

[1]   This body was established in April 2016 as a special task force to clean up and rectify
problems in the field of internet finance.  It is led by the PBOC, with members from several
other government agencies such as the China Banking Regulatory Commission, China
Insurance Regulatory Commission, China Securities Regulatory Commission, and State
Administration for Industry and Commerce.

from the securities regulator.  Article 10 of the Securities Law provides that

> A public issuance of securities shall meet the requirements of the relevant laws and administrative regulations, and shall be reported to the securities regulatory authority under the State Council or any department as authorized by the State Council for examination and approval according to law.  Without any examination and approval according to law, no entity or individual may make a public issuance of any securities.

18.     The definition of securities is not fully clear in China.  Article 2 of the Securities Law provides that "[t]he present Law shall apply to the issuance and trading of stocks, corporate bonds as well as any other securities as lawfully recognized by the State Council within the territory of the People's Republic of China."

19.     The tokens issued through ICOs could potentially fall within the scope of Article 2 of the Securities Law, and hence, if used without approval from the regulator, could under certain circumstances constitute the illegal issuance of securities.

20.     For the issue of "illegal fundraising," one needs to look at the *Interpretation of Several Issues by the Supreme People's Court on the Specific Application of Law in the Handling of Criminal Cases about Illegal Fundraising* ("SPC Interpretation").  Article 2 of the SPC Interpretation provides a long list of activities that may constitute "illegal fundraising" in China.  Of particular relevance to the present case is Article 2(4) of the SPC Interpretation which provides that an individual engages in "illegal absorption of public savings" by "illegally absorbing funds in the form of commodity repurchase, commissioned sale of commodities, etc. without really selling commodities or providing services, or not for the primary purpose of selling commodities or providing services."

## IV.     THE ONETHING CLOUD AND ONETHING CLOUD REWARD PROGRAM

### A.     Background on the OneThing Cloud and the Rewards Program

21.     Based on my review of publicly available information, I understand the following

about the OneThing Cloud and the Rewards Program.

22.     The OneThing Cloud is intelligent internet hardware with features developed around the idea of sharing economy.  Specifically, it provides the services of accelerated downloading, convenient real-time storage, file management, remote file access, and multi-media entertainment.  Users may also share their idle computing resources through the device.

23.     Under the Rewards Program, Xunlei clients will be rewarded with OneCoins,[2] depending on their contribution of computing resources to Xunlei's cloud computing network, which is decided by, among others, their idle computing resources capacity, storage space, and online time length.  In essence, Xunlei acts as an intermediary to help match the client who needs computing resources with the client who has idle internet resources.

24.     It should be noted that Xunlei clients can choose whether to participate in the Rewards Program, and if they choose to participate, there is no further fee charged.  Whether a client joins the Rewards Program does not affect his or her access to other services provided by the OneThing Cloud, including high speed downloading, data synchronization, file management, remote operation, etc.

25.     OneCoin tokens can be redeemed for OneCoin-specific products and services offered by Xunlei and its business partners.  The OneCoin-specific offerings were limited at the outset of the Program, but have expanded over time to include membership cards of varying time lengths offered by Xunlei and its business partners that provide entertainment services.

**B.     Plaintiffs' Allegations Related to the OneThing Cloud and the Rewards Program**

26.     It is alleged that the following false and misleading statements were made in:

---

[2]     On December 9, 2018, Xunlei announced that the renaming of OneCoin to LinkToken.  Its functions, however, remained unchanged.

(i) Xunlei's press release of 10 October 2017: paras 42-43 of the pleading, (ii) a news article of 16 October 2017: paras 44-45, (iii) Xunlei's press release of 16 November 2017: paras 47-48, and (iv) Xunlei CEO, Chen Lei's conference call on 16 November 2017: paras 49-54.

27.     The common reasons provided for the allegations is that Xunlei failed to disclose (a) that Xunlei's promotion and offering of OneCoin violated Chinese regulations; (b) that the offering of OneCoin via the sale of the OneThing Cloud devices was a disguised ICO; and (c) that even if it could technically be classified as an Initial Miner Offering rather than an ICO, the offering of OneCoin via the sale of the OneThing Cloud devices served the same economic function as an ICO and violated bans on token-based financings.

## V.     APPLICATION OF CHINESE LAW ON ICOS TO THE ONETHING CLOUD AND THE REWARDS PROGRAM

### A.     Whether the OneThing Cloud and the Rewards Program Constitute an ICO under the 2017 ICO Notice

28.     It is my opinion that the OneThing Cloud and the Rewards Program do not constitute an ICO.

29.     As noted earlier, Article 1 of the 2017 ICO Notice refers to an ICO as a form of fundraising activity by issuing new cryptocurrencies or tokens in exchange for a payment in other widely-accepted cryptocurrencies such as Bitcoin and Ethereum.

30.     From the perspective of the deal structure, OneCoins are not issued for other widely-accepted cryptocurrencies, but rather distributed under a reward scheme that Xunlei clients can choose to participate in free of charge.  Because OneCoins are distributed to Xunlei clients for no money (but rather, only in exchange for idle computing resources), it does not qualify as "illegal sales and distribution of crypto currency and tokens" from the perspective of investor protection under Article 1 of the 2017 ICO Notice.

31.     From the perspective of the price Xunlei clients pay, the Rewards Program is not

a fundraising exercise.  The online listing price for the OneThing Cloud has varied from RMB399 to RMB599, and is equal to or even lower than the price for similar products in the market.  Hence, the transaction involving the OneThing Cloud is a genuine one, as opposed to a disguised form of fundraising where the seller sells its products at a price inexplicably higher than its market price so as to make the transaction involving the product a mere sham.  Further, the OneThing Cloud offers users internet acceleration service, and Xunlei offers such services in a separate membership subscription product that can be purchased for an annual subscription.  Thus, OneThing Cloud users enjoy added benefits.  Finally, Xunlei clients do not receive any tokens from the purchasing of the OneThing Cloud.  Xunlei clients receive tokens only after choosing to join the Rewards Program and, as discussed above, the amount of tokens rewarded depends upon the computing capacity donated, not the price paid for the OneThing Cloud.

32.     From the perspective of the value and rights of OneCoins, Xunlei authorizes only their users to exchange for specific products or services in the online shop operated by Xunlei, in much the same way as frequent flyer points can be used to exchange for goods in the online shop operated by airlines.  Unlike the virtual currency issued in some ICOs, OneCoins do not provide any shareholder rights and do not represent an ownership stake in the company, so OneCoins are not shares.  Further, the holder of OneCoins is not paid interest for a debt or liability owed by the issuer, so OneCoins are not debentures.  Rather, OneCoins are similar to frequent flyer points rewarded by airlines or membership points rewarded by supermarkets.

33.     While OneCoins were allegedly traded on third-party platforms during the class period, even if true, this does not make OneCoins an ICO activity.  The offering and trading of coins are two distinct processes.  Activities that occur after an offering are not relevant to whether the offering qualifies as an ICO.  In any event, the complaint does not allege—and I

have seen nothing to suggest—that the third-party platforms are in any way affiliated with or sponsored by Xunlei.  In fact, Xunlei's statements suggest just the opposite: it announced on 19 October 2017, that "[t]here is no official trading platform" for OneCoins, and that "we do not encourage users" to participate in third-party platforms (Press Release, cited at FAC ¶ 46), and disclosed on 9 December 2017, changes in the Rewards Program designed to frustrate unauthorized trading platforms in OneCoins (Press Release, cited at FAC ¶ 60).

34.     In sum, based on publicly available information, I believe that from the perspective of both form and substance that the OneThing Cloud and the Rewards Program do not constitute an ICO, do not serve the same economic function as an ICO, and do not violate any bans on token-based financings.

**B.     Whether the OneThing Cloud and Rewards Program Violate Chinese Law**

35.     It is my opinion that the OneThing Cloud and the Rewards Program do not violate Chinese laws and regulations.

36.     As noted above, the OneThing Cloud and the Rewards Program do not constitute an ICO, and thus there is no violation of the 2017 ICO Notice.

37.     Further, the sale of the OneThing Cloud and the Rewards Program are genuine transactions, not financing activities, such that there is no violation of the law on illegal public financing activity in China.

38.     OneCoins are not issued for the purpose of fundraising and are not similar to stocks, bonds, or debentures.  As a result, they do not bear the essential characteristics of securities set forth in Article 2 of the Securities Law, and thus do not constitute the illegal issuance of securities under Chinese law.

39.     The issuance of OneCoins also does not constitute illegal fundraising under the SPC Interpretation.  Xunlei does not collect any funds or legal tender from the OneThing Cloud

users or third-parties in exchange for OneCoins, an essential feature of fundraising activities.

40.     The 12 January 2018 Notice by the National Internet Finance Association of China ("2018 NIFA Notice") referenced by Plaintiffs in their pleading does not provide a sound legal basis for the allegations made by Plaintiffs in this case.

41.     For background, the National Internet Finance Association of China ("NIFA") was established on 25 March 2016 and is a self-regulatory industry body in the field of internet finance.  NIFA is not a government regulator in the Chinese administrative system.

42.     Under the legislative system in China, the rules or announcements issued by self-regulatory industry bodies do not carry the force of law, and failure to comply with them does not by itself render a person liable in any judicial proceedings.

43.     From the language in the 2018 NIFA Notice, I believe that NIFA may not have fully understood the nature of the OneThing Cloud and the Rewards Program.

44.     Tellingly, to date, no governmental financial regulators—such as the PBOC, China Banking Regulatory Commission (now reorganized as China Banking and Insurance Regulatory Commission), and China Securities Regulatory Commission—have taken NIFA's position and made any rules, brought any actions, or even expressed any views relating to Xunlei's OneCoin, the OneThing Cloud, or the Rewards Program.

45.     Based on the foregoing, I believe that the OneThing Cloud and the Rewards Program do not violate Chinese laws or regulations.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.


Executed on August 2, 2018

Hui (Robin) Huang

10