UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                        :

IN RE XUNLEI LIMITED SECURITIES    :        18 Civ. 467 (PAC)
LITIGATION

                        :        **OPINION & ORDER**

                        :

                        :
------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

      This is a consolidated federal securities class action brought by Lead Plaintiffs Tongyan Wang and Yuyan Jia and additional named Plaintiff Peng Li, on behalf of a class consisting of individuals who purchased or otherwise acquired American Depositary Shares from Xunlei Limited between October 10, 2017 and January 11, 2018 (the "Class Period"). The Defendants are Xunlei and Xunlei's Chief Executive Officer Lei Chen, who, according to the First Amended Complaint, made six materially false and misleading statements during the Class Period following the launch of Xunlei's OneCoin Rewards Program. Plaintiffs allege that the OneCoin Rewards Program was illegal and banned in China; but that Defendants failed to disclose its illegality to American investors in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

      Defendants move to dismiss the First Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. 32). The Court GRANTS Defendants' motion.[1]

---

[1] This action was initially assigned to Judge Richard J. Sullivan but was reassigned to this Court following Judge Sullivan's elevation to the Second Circuit.

## BACKGROUND[2]

According to the First Amended Complaint (the "FAC"), Xunlei Limited ("Xunlei" or the "Company") is an internet company operating primarily in China providing services such as content delivery network ("CDN"), download acceleration, video and gaming acceleration, and distributed cloud storage. (¶ 2).  Xunlei commenced operations in 2003 and in 2014, began offering American Depositary Shares ("ADSs") on the NASDAQ Global Select Market ("NASDAQ"), where they trade under the symbol "XNET." (*Id.* ¶¶ 22-23).

Xunlei initially operated as a subscription-based provider of download torrent acceleration services where users, in exchange for monthly fee, were permitted to leverage Xunlei's network to increase their download speed. (*Id.* ¶ 23).  The Company also offered a content delivery network ("CDN") service which enabled enterprise customers to make their media more quickly available to internet consumers by distributing media within a network of local nodes instead of a central server. (*Id.* ¶ 24).

Following a decline in its download acceleration business, Xunlei launched "Project Crystal," a decentralized, cloud-based system that "crowdsourced" its users' computing power for bandwidth and storage. (*Id.* ¶ 25).  In 2017, Project Crystal was transformed into a commercial product launched under the name Xunlei Zhuanqian Bao, or ZQB, a hardware box which enabled users to make a private cloud for the storage and exchange of their own files, similar to Google Drive or Dropbox. (*Id.*)  ZQB users could also "Make Money" by providing their idle bandwidth, storage and computing power to Xunlei, which in turn used the bandwidth to power content

---

[2] The facts are taken from the First Amended Complaint and documents incorporated by reference and are accepted as true for the purpose of Defendants' motion to dismiss. *See Royce Corley v. Cyrus R. Vance, Jr.et al*, No. 15 CIV. 1800 (KPF), 2019 WL 3841939, at *6-7 (S.D.N.Y. Aug. 15, 2019). "However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Schentag v. Nebgen*, No. 1:17-CV-8734-GHW, 2018 WL 3104092, at * 1 n.1 (S.D.N.Y. June 21, 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation omitted)).

delivery network services. (*Id.*)  Xunlei benefited from this program because, by leveraging the resources of its users, it avoided having to purchase the servers needed to expand its CDN network itself. (*Id.*)

OneThing Cloud & the Rewards Program

In September 2017, Xunlei launched OneThing Cloud, the successor to ZQB and Project Crystal. (*Id.* ¶ 25).  OneThing Cloud is a network linked storage device that utilizes blockchain technology to enable multiple users to share online storage remotely, instead of from a centralized server. (*Id.* ¶ 25).  A month later, on October 10, 2017, Xunlei announced the launch of the OneCoin Rewards Program (the "Rewards Program") through a press release (the "Oct. 2017 Press Release"). (*Id.* ¶¶ 25, 29).  According to the Oct. 2017 Press Release, beginning on October 12, 2017, in addition to using the device to manage their own storage, owners of OneThing Cloud could leverage their excess bandwidth, storage, and computing power to "mine"[3] a new cryptocurrency called OneCoin. (*Id.*¶ 29).  Xunlei also incorporated a wallet program (the "Wallet App") into the Rewards Program which enabled users to "receive and send OneCoin." (*Id.*).

Xunlei's Rewards Program officially only provided for the exchange of OneCoin for other OneCoin-specific products and services that would otherwise cost hard currency. (*Id.* ¶ 30). During the Class Period, however, speculators created markets for trading which enabled users to exchange their OneCoin for hard currency, like yuan (China's currency), or cryptocurrencies like Bitcoin or Ethereum. (*Id.* ¶ 33).  Owners of OneCoin could trade them on Fatbtc, a third-party trading platform, LinkEX, self-described as a "Leading OTC Digital Currency Marketplace," feixiahao.com, a cryptocurrency trading site, and chat groups including "QQ chat." (*Id.* ¶¶ 34-38). Several discussion forums, including a forum posted on Xunlei's website, also discussed the ability

---

[3] The process of exchanging computing resources for cryptocurrency is generally referred to as "mining." (FAC ¶ 3).

to trade OneCoin via QQ chat groups, (*id.* ¶ 39), and online tutorials provided step-by-step instructions on how to trade OneCoin for cash and other cryptocurrencies. (*Id.* ¶ 40).

Xunlei never sponsored or affiliated with these third-party platforms, but it did maintain the functionality of its Wallet App throughout the Class Period, which enabled the extraction of OneCoin to third-party websites and trading platforms. (*Id.* ¶ 41). Xunlei also promoted OneCoin as a way for users to make money (*Id.* ¶ 31). The initial name for the project—OneCoin or WanKeBi in Chinese — incorporates the Chinese symbol for currency. (*Id.* ¶ 5). Xunlei's webpage promoting the OneCoin Rewards Program also stated:

> Your private gold mine is lying there to 'make money. The 'Zhangqian Bao' [literal translation: Make Money Treasure] team is making another masterpiece, a new generation of sharing economy intelligent hardware, sharing idle bandwidth, without manual operation, easily gaining income. A reward worth one billion yuan is waiting for you to come and achieve the dream of "making money" while lying down.

(*Id.* ¶ 31 (*quoting* https://www.thepaper.cn/newsDetail_forward_1825077)(translated)).

Xunlei also structured the Rewards Program in a manner that mimicked features often associated with an Initial Coin Offering ("ICO"). (*Id.* ¶¶ 30-32.) The Company "created a sense of urgency by making the cost cheaper—and the economic upside greater—for OneCoin/LinkToken's earliest adopters." (*Id.* ¶ 32.) Xunlei incorporated a "halving" feature into OneCoin so that the daily number of OneCoin issued to all miners on the OneThing Cloud network would be cut in half each year. (*Id.*) The maximum amount of OneCoin that could be issued per day was limited to 1.6 million and Xunlei also told users that no more than 1.5 billion OneCoin would ever be issued. (*Id.*)

Investor expectations for Xunlei's Rewards Program made Xunlei's stock one of the best performing stocks in the world over the six weeks following its launch, boosting shares from under $5 to a high of $27.00. (*Id.* ¶ 6).

4

China's Token Fundraising Ban

The same month Xunlei launched OneThing Cloud, on September 4, 2017, the People's Bank of China, Central Network Information Industry, Ministry of Industry and Information Technology, China Securities Regulatory Commission, China Banking Regulatory Commission, China Securities Regulatory Commission, and China Insurance Regulatory Commission jointly issued a notice regarding "Fundraising through Coin Offering" (the "2017 ICO Notice"). (*Id.* ¶ 28; Pao Ex. I., Dkt. 34.)[4] The 2017 ICO Notice describes the central elements and risks associated with "fundraising activities through issuing tokens including Initial Coin Offering (ICO)" and goes on to formally and immediately ban "fundraising through coin offering." (Pao Ex. I at 1). The 2017 ICO Notice further prohibits "any so-called token that provide[s] trading and exchange services for coin offering [from] engag[ing] in exchange businesses between legal tender and token or "virtual currency," and bans "financial institution[s] and non-bank payment institution[s]" from "directly or indirectly provid[ing] products for the issuance of token financing and 'virtual currency.'" (*Id.*)

Xunlei did not address the 2017 ICO Notice or its impact on the Rewards Program in the Oct. 2017 Press Release. (FAC ¶ 43). On October 16, 2017, an article published in Yicai Global, quoted OneThing Technology Co., a subsidiary of Xunlei, denying accusations that the Rewards Program was a banned ICO. (*Id.* ¶ 44). The article quoted an unnamed speaker from OneThing Technology Co. stating that OneCoin could not be a banned ICO because "OneCoins can only be used for the exchange of Xunlei products." (*Id.*)

Three days later, on October 19, 2017, Xunlei published a statement on the Chinese version of its OneThing Cloud domain only about the use of OneCoin. (*Id.* ¶ 46). The statement

---

[4] Pao Ex. I is the full English version of the 2017 ICO Notice, referenced in the FAC at ¶ 28.

acknowledged that OneCoin was being traded on third-party platforms and warned users of the

risks associated with such trading, stating:

> 1. There is no official trading platform for OneCoins, and we do not encourage users to engage in OneCoin transactions. Any OneCoin trading platform that is circulating in the network is not an official platform. Please look for the only official website of OneCoin: http://red.xunlei.com. We reserve the right to pursue the legal liability against any suspected illegal use of the registered trademark of OneCoin, plagiarism of the official website of OneCoin, and platforms, websites or products illegally using words like "OneCoin official" for publicity. At the same time, we once again remind the OneCoin holders that OneThingTech cannot guarantee or be responsible for the legality, accuracy, authenticity, applicability and security of any non-official platform, website, community, etc. The holders should carefully distinguish them in the operation of OneCoin and take prudent precautions to avoid fraud and loss of assets.

> 2. Like other virtual digital assets based on blockchain technology, once withdrawn to the Wallet, OneCoin is owned by the user. In the case of a wrong transfer, lost key, forgotten password, etc., OneCoin cloud team can't help recover it. At the same time, when activating or participating in the "OneCoin Incentive", please be sure to read the user agreement carefully and follow the relevant provisions of the agreement. In the event of any person infringement, property damage, defamation of reputation or goodwill, copyright or intellectual property right infringement caused by trusting and using third party websites, platforms, information and services in products, or maloperations, OneThingTech can't help users to recover their losses. Please be careful in your operation!

(Pao Ex. C).[5]

On November 16, 2017, Xunlei issued a press release which it also attached as exhibit 99.1

to the Form 6-K filed with the SEC on November 20, 2017 (the "Q3 Press Release"). (FAC ¶ 47).

Regarding the Rewards Program, the Q3 Press Release quoted Chen stating, "[o]ur crowd-sourced

computing technology utilizes idle computing power including bandwidth, storage and CPU from

individual bandwidth contributors to make internet more affordable to everyone." (*Id.*)

That same day, Chen spoke on a conference call to discuss the Company's financial and

---

[5] Pao Exhibits C and E are English translations of documents originally in Chinese incorporated by reference in the FAC at ¶ 46 and ¶ 60. These translated documents are admissible because they are accompanied by executed translation certifications. *See Contrera v. Langer*, 290 F. Supp. 3d 269, 278 (S.D.N.Y. 2018), *report and recommendation adopted*, No. 16 CV 3851-LTS-GWG, 2018 WL 3918179 (S.D.N.Y. Aug. 16, 2018) (considering a certified translated document on a motion to dismiss).

operating results for the third fiscal quarter ending September 30, 2017 (the "Q3 2017 Conf. Call").
(*Id.* ¶ 48). During the call, Chen described the Rewards Program as a "voluntary OneThing
incentive program" where "users give permissions[sic] to us to use their idle bandwidth storage
and CPU through OneThing Cloud and receive a blockchain based crypto token as reward." (*Id.* ¶
49.) Chen also said that the program was "fairly popular among OneThing Cloud users." (*Id.*).
When asked about Xunlei's plans regarding OneCoin, Chen said the Rewards Program enabled
Xunlei to offer the OneThing Cloud product at a "slightly lower the[sic] market" rate, but clarified
that "[f]rom the beginning we as company has[sic] no plan at all to monetize on this coin, and we
certainly do not in the future." (*Id.* ¶ 51). Chen was later asked what distinguished Xunlei's
Reward Program from an ICO, to which he replied:

> Well, the explanation – the definition of ICO I think we're as a private company
> we're not in the position to comment what is the very definition of ICO. But what
> I can tell our investors is that, we work closely with the regulatory authorities in
> China and we follow all the local regulations and laws. And we conduct business,
> we have been conducting business and we will conduct business in a manner that
> is honest and responsible, and meet [sic] all the regulations as law requirements.

(*Id.* ¶ 53).

<u>Public Accusations of Illegality & Subsequent Stock Price Drop</u>

On November 28, 2017, Xunlei announced on its Weibo social media account that it was
revoking the authorization for Xunlei's business partner Shenzhen Xunlei Big Data Information
Services Company Ltd. ("Big Data")[6] to use Xunlei trademarks and branding. (*Id.* ¶ 55.) Hours
later, Yu Fei, then Senior Vice President of Xunlei and Chairman of Big Data, accused Xunlei of
revoking Big Data's authorizations in retaliation for Big Data's refusal to support Xunlei's
OneCoin activities. (*Id.* ¶¶ 7, 56). Specifically, Fei described OneCoin as a "disguised ICO" and
an "illegal fund-raising scam," and hinted that Xunlei was already being investigated by Chinese

---

[6] Around that time, Xunlei had a 28.77% equity interest in Xunlei Big Data. (FAC ¶ 58).

regulators for its OneCoin program. (*Id.* ¶ 56).

Following Xunlei's post and Fei's response, Xunlei's ADS price declined on November 28, 2017 from the prior day close of $21.01 to $18.58, a drop of approximately 11.6%. (*Id.* ¶ 57). The following day, Xunlei issued a press release confirming that it had rescinded Big Data's right to use the Xunlei brand and brand name. (*Id.* ¶ 58). The press release also addressed rumors about the illegality of the Rewards Program, stating:

> As a listed company, Xunlei's policy is to abide by applicable laws and government regulations, implement corporate governance and operate strictly under the guidance                           of                          the                          Board.

> To ensure sustainable operations and to protect all stake holders, the Company will maintain and engage in proactive communications with authorities and implement an ID registration system in mid-December for the operation of [OneCoin] and other preventive measures to ensure that the operation of [OneCoin] and other business activities are in compliance with relevant laws and government regulations.

> The Company believes that [OneCoin] is a kind of digital asset and can be used on the Company's internet properties and should not be traded on other transaction platforms. When developing blockchain technology, the Company utilizes such features as openness, transparence and security for their applications. [OneCoin] is only a symbol of proof for these applications, rather than a subject of speculation.

(*Id.* ¶ 58).  Following this announcement, Xunlei ADS further declined $5.78 on November 29, 2017, to a close at $12.80, a drop of approximately 31.1%. (*Id.* ¶ 59).

On December 9, 2017, Xunlei announced it would change the name of OneCoin to LinkToken and would change the name of the Wallet App from "OneCoin Wallet" to "LinkToken Pocket." (*Id.* ¶ 60).  Following this announcement, Xunlei ADS's rose by 29%, from $11.98 to $15.50, when trading resumed on December 11, 2017 (*Id.*)

On January 12, 2018, however, the National Internet Finance Association of China ("NIFA"), a national self-regulatory organization formed by multiple ministries, commissions and the People's Bank of China, issued a "Risk Alert" notice regarding Xunlei (the "NIFA Risk Alert")

(*Id.* ¶ 61).  The NIFA Risk Alert described the newly renamed LinkToken as "a potentially risky model that warrants vigilance" in light of the 2017 ICO Notice. (*Id.*)  The announcement further discussed LinkToken saying:

> In the case of [LinkToken] issued by Xunlei, for example, the issuing company in effect substitutes [LinkToken] for the duty to pay back project contributors with legal tender, making it essentially a financing activity and a form of disguised ICO. In addition, with frequent promotional activities and publishing of trading tutorials, Xunlei has lured many citizens without sound discernment into IMO activities.

(*Id.*).  Following the NIFA Risk Alert, Xunlei's ADS price declined $6.27 from a close on January 11, 2018 at $22.90 per ADS, to a close at $16.63 per ADS on January 12, 2018, a drop of approximately 27.38%. (*Id.* ¶ 62)

Procedural History

The FAC consolidates the complaints filed by Plaintiff Runcie Dookeran on January 18, 2018 (18-cv-467, Dkt. 1) and Plaintiff Peng Li on January 24, 2018 (18-cv-646, Dkt.1).  The two actions were consolidated pursuant to Fed. R. Civ. P. 42(a) on April 12, 2018 and Tongyan Wang and Yuyan Jia were appointed Lead Plaintiffs. (Opinion & Order, Dkt. 19).  The FAC is brought by Lead Plaintiffs Wang and Jia and individual Plaintiff Peng Li who acquired Xunlei securities during the Class Period and suffered losses as a result of Xunlei's volatile stock prices following Fei's public statement and the NIFA Risk Alert. (*Id.* ¶¶ 17-18).  They bring this action on behalf of a class consisting of all those who purchased or otherwise acquired Xunlei securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. (*Id.* ¶ 64).

Defendants move to dismiss the FAC for failure to state a claim. (Dkt. 33).

## DISCUSSION

I. **Legal Standards**

   A. **Pleadings**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss pursuant to the Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

Allegations of securities fraud must meet the heightened pleading standards of both the Federal Rule Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). *See In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 398 (S.D.N.Y. 2016). Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (internal quotation omitted). The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and adds the requirement that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 608 (S.D.N.Y. 2017).

### B. Scope of Consideration

"On a 12(b)(6) motion, a court may look[ ] only to the complaint; documents that are attached as exhibits to, incorporated by reference, or integral to the complaint; and matters of which judicial notice may be taken." *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) (quoting *Rhee-Karn v. Burnett*, No. 13 Civ. 6132, 2014 WL 4494126, at *3 (S.D.N.Y. Sept. 12, 2014). In federal securities cases, the Court may also "take judicial notice of public disclosure documents that must be filed with the [SEC] and documents that both bear on the adequacy of SEC disclosures and are public disclosure documents required by law." *In re Express Scripts Holding Co. Sec. Litig.*, No. 16 CIV. 3338 (ER), 2017 WL 3278930, at *8 (S.D.N.Y. Aug. 1, 2017) (internal quotations omitted).

When resolving a question of foreign law, however, the Court may look to "any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; *see also CIH Int'l Holdings, LLC v. BT United States, LLC*, 821 F. Supp. 2d 604, 608 n.1 (S.D.N.Y. 2011). When assessing the testimony or declaration of foreign law experts, "it is not the credibility of the experts that is at issue, it is the persuasive force of the opinions they express[]." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 92 (2d Cir. 1998).

## II.    Analysis

### A. Claim under Section 10(b) Against All Defendants

Section 10(b) of the Exchange Act makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance..." 15 U.S.C. § 78j(b). Rule 10b-5 implements the statute and prohibits the making of "any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).   To bring a successful claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege sufficient facts to establish: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16CIV6728CMRWL, 2019 WL 2428529, at *5 (S.D.N.Y. June 11, 2019) (*quoting City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 65 (S.D.N.Y. 2015)).

Defendants contend that the FAC fails to state a violation of Section 10(b) or Rule 10b-5 because Plaintiffs have not pled a material misstatement or omission, scienter or loss causation. After careful consideration of relevant Chinese law[7] and the facts alleged in the FAC, the Court agrees.

### 1. False or Misleading Statements and Omissions

"A statement is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010).   Determining whether a statement is misleading is generally a question reserved for the trier of fact "unless the Court, drawing all reasonable inference in favor of the plaintiff, determines that reasonable minds could not differ on the question of whether the statements alleged in the

---

[7] Defendants filed a notice of intent to rely on foreign law pursuant to Fed. R. Civ. P. 44.1, (Dkt. 31), and subsequently submitted a declaration of Professor Robin Huang, an expert in Chinese law, in support of their motion. (Dkt. 35). Consistent with Rule 44.1, the Court considers and assesses the persuasiveness of Professor Huang's declaration in deciding whether the Rewards Program violates or ever did violate Chinese law.  Professor Huang's opinion about NIFA's reasons for issuing the NIFA Alert, (*see* Huang Decl. ¶ 43), however, goes beyond the scope of his expertise and has not been considered. *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016) ("an expert's testimony on the intent, motives or states of mind of corporations, regulatory agencies and others is inadmissible.")

complaint were misleading in light of the circumstances under which they were made. *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 677 (S.D.N.Y. 1990).

Regarding omissions, "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b–5." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100–01 (2d Cir. 2015) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17, 108 S. Ct. 978, 987, 99 L. Ed. 2d 194 (1988)). Generally, then, "an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *Id.* (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir.1993)). Still, even where there is no independent duty to disclose, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016); *accord Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016).

As for materiality, "[a] misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision." *Freudenberg*, 712 F.Supp.2d at 181; *see also Basic*, 485 U.S. at 240, 108 S.Ct. 978. Similar to the "misleading" inquiry, "the question of whether a reasonable investor would find a particular misrepresentation or omission 'material' to an investment decision is usually a matter reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017). Still, a court should nonetheless dismiss a complaint for failure to plead materiality where the statements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

### a.   The Alleged Illegal Conduct

All of the misstatements or omissions alleged in this action stem from Plaintiffs' allegation

that Xunlei's offering of OneCoin through the Rewards Program violated Chinese regulations, operated like a disguised ICO, and/or violated China's ban on token-based financing. (*See* FAC ¶¶ 42-54). "When a securities fraud action rests on the failure to disclose uncharged illegal conduct, the complaint must state a plausible claim that the underlying conduct occurred." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 578 (S.D.N.Y. 2016); *accord In re Yukos Oil Co. Sec. Litig.*, No. 04 CIV. 5243 (WHP), 2006 WL 3026024, at *14 (S.D.N.Y. Oct. 25, 2006) ("[T]he Complaint fails to plead with particularity sufficient facts demonstrating that Yukos' tax strategy violated Article 40 of the Russian Federation Tax Code.")

Plaintiffs do not allege that a Chinese legal or regulatory entity has taken formal action against Xunlei regarding its issuance of OneCoin, the OneThing Cloud, or the Rewards Program. Thus, to state a claim, the FAC must plausibly allege that notwithstanding this inaction by Chinese authorities, Xunlei's conduct did in fact violate Chinese law during the Class Period.

### i.   The 2017 ICO Notice

Article II of the 2017 ICO Notice officially bans "fundraising through coin offering" in China. (Pao Ex. I).  Article I of the 2017 ICO Notice defines the "essential attributes of fundraising through coin offering" as:

> financing bodies raising virtual currencies such as Bitcoin or Ethereum from investors through illegal sales and circulation of crypto currency or tokens. Such offerings, in essence, are unauthorized and illegal public fundraising and are suspected of involving in criminal activities such as illegal selling of tokens, illegal issuance of securities, illegal fundraising, financial fraud and pyramid schemes.

(*Id.*)  The ICO Notice further bars platforms "that provide trading and exchange services for coin offering from: engag[ing] in exchange businesses between legal tender and token or 'virtual currency"; "engag[ing] in proprietary trading activities or trading as an[sic] central counterparty of tokens or 'virtual currencies'"; or "provid[ing] pricing services or act[ing] as information

14

intermediary for tokens or virtual currencies." (*Id.*)

The 2017 ICO Notice indisputably bans ICO's in China. Commentators and Chinese law experts have noted, however, that what constitutes an ICO, and consequently triggers the ban, is less clear. (*See* Reuters Article, Def. Ex. J, at 4 ("'On the regulation of this area in China, I have concluded that there is no clarity about what is and is not permitted,' said another bitcoin expert David Yermack, a professor at the New York University Stern School of Business."); Huang Decl. ¶ 12 ("Although the 2017 ICO Notice clearly bans ICOs in China, it is not fully clear what amounts to an ICO. As noted above, Article 1 of the 2017 ICO Notice refers to "illegal sales and circulation of crypto currency or tokens," which suggests that the sale and circulation of crypto currency or tokens can be either legal or illegal, depending on the particular circumstances of each case.")). Indeed, two days before the 2017 ICO Notice was issued, a Chinese task force charged with addressing problems in the internet finance industry concluded that determining whether something is an unlawful ICO necessitates a case-by-case assessment. (Huang Decl. ¶¶ 12-15). [8] This particularized assessment, in turn, must be analyzed within the broader context of China's securities and fundraising laws.

ii. **China Securities & Fundraising Law**

The issuance of securities in China is governed by the Securities Law of the People's Republic of China as amended in 2014 ("China Securities Law"). Article 10 of the Securities Law prohibits any entity or individual from publicly issuing a security unless it "meet[s] the requirements of the relevant laws and administrative regulations, and [is] reported to the securities

---

[8] The Securities and Exchange Commission has taken a similar particularized approach to token regulation in the United States. *See* Michael Mendelson, *From Initial Coin Offerings to Security Tokens: A U.S. Federal Securities Law Analysis*, 22 Stan. Tech. L. Rev. 52, 68 (2019) ("Simply put, if a digital token is a security, its sale must be registered unless it falls within an established exemption under the 1933 Act or SEC Rules. However, not all tokens or token sales may involve securities and therefore the SEC appears determined to take a case-by-case approach.")

regulatory authority under the State Council or any department as authorized by the State Council for examination and approval according to law." (Huang Decl. ¶ 18).[9]  While a security is not explicitly defined, Article 2 of the China Securities Law provides that "[t]he present Law shall apply to the issuance and trading of stocks, corporate bonds as well as any other securities as lawfully recognized by the State Council within the territory of the People's Republic of China." (*Id.*)

Regarding illegal fundraising, the "Interpretation of Several Issues by the Supreme People's Court on the Specific Application of Law in the Handling of Criminal Cases about Illegal Fundraising" ("SPC Interpretation") provides a list of activities that may constitute illegal fundraising under China's laws. (Huang Decl. ¶ 20).  Relevant here, one of those activities, listed in Article 2(4) of the SPC Interpretation, is engaging in the "illegal absorption of public savings" by "illegally absorbing funds in the form of commodity repurchase, commissioned sale of commodities, etc., without really selling commodities or providing services or not for the primary purpose of selling commodities or providing services." (*Id.*)

### iii.    OneCoin, OneThing Cloud & the Rewards Program

Plaintiffs take the position that the Reward Program's illegality is not in dispute because it has already been conclusively resolved by NIFA. (*See* Pl.'s Mem. in Opp. at 17).  This, however, is clearly not the case.  The NIFA Alert describes Xunlei's Rewards Program as a "potentially risky model that warrants vigilance" (FAC ¶ 61); it does not definitely state that the Rewards Program is illegal, or that it violates the 2017 ICO Notice.  Moreover, NIFA is an industry self-regulatory organization whose statements do not have the force of law. (*See* Huang Decl., Dkt. 35,

---

[9] *Accord* Securities Law of the People's Republic of China, *Ministry of Commerce People's Republic Of China*, available at http://english.mofcom.gov.cn/article/policyrelease/internationalpolicy/200703/20070304466356.shtml (last updated March 16, 2007).

¶¶ 41-42). Fei's statement that the Rewards Program "is a disguised ICO, and is an illegal fund-raising scam," (FAC ¶ 56), also cannot conclusively resolve this issue. As a legal conclusion on an ultimate issue, Fei's statement cannot be deemed an admission on behalf of Xunlei. *See Eagleston v. Guido*, 41 F.3d 865, 873–74 (2d Cir. 1994) (fact witness's testimony that conduct violated equal protection rights "do[es]not amount to a party admission" under Federal Rules of Evidence); *Great Am., E & S Ins. Co. v. Hartford Fire Ins. Co.*, No. 09 Civ. 10010 (PAC) (GWG), 2012 WL 3186086, at *9 (S.D.N.Y. Aug. 3, 2012).

Absent conclusive authority on the legality of Xunlei's Rewards Program under Chinese law, the Court must make its own assessment. *See Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998). Turning to the conduct at issue, Plaintiffs do not allege that Xunlei fundraised or raised money in any way through the Rewards Program. Nor do they allege that the OneThing Cloud is a sham, inoperable device, or that Xunlei ever offered OneCoin in exchange for legal or virtual tender.[10] They also do not allege that Rewards Program participants obtained any rights as stock or bond holders, or that Xunlei itself ever offered anything other than OneCoin-specific products or services. Instead, Plaintiffs allege that third-party speculators (not Xunlei) created markets for trading OneCoin, but that Xunlei encouraged this trading by incorporating a sense of urgency into the Rewards Program, (*see* FAC ¶ 32), and advertising and maintaining the functionality of the Wallet App, which made the extraction of OneCoin to these other platforms possible. (*Id.* ¶ 42). At least implied in Plaintiffs' FAC is the sense that because the trading of OneCoin vastly increased interest in the OneThing Cloud device and participation in Xunlei's Rewards Program generally,[11]

---

[10] According to one article referenced in the FAC at Paragraphs 32 and 33, the OneCloud device was being sold online for about 2,000 yuan "by enterprising types" during the Class Period. (Pao Ex. K at 7). Plaintiffs do not allege, however, that Xunlei itself ever offered the device above market rate.

[11] One news source reporting on Xunlei during the Class Period reported that "over 24 million people have pre-ordered the [OneCloud] device on the website of Xunlei, which has struggled to meet demand." (Pao Ex. K).

Xunlei intentionally stood idly by as the illegal trading occurred. (*See, e.g., id.* ¶ 31).

Accepting the facts in the light most favorable to Plaintiffs, this all may be true,[12] but it is not illegal. Plaintiffs' allegations essentially boil down to a theory of "aiding and abetting" or "willful blindness," accusations for which liability does not attach under China's securities and fundraising laws. Nothing in the 2017 ICO Notice or the China Securities Law places an affirmative duty on the issuers of a token to control or prevent subsequent trading of that token on platforms it neither affiliates with nor sponsors. Xunlei's Rewards Program did not violate Chinese law during the Class Period.

Plaintiffs, relying on *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 353 (S.D.N.Y. 2012), argue that any disagreement with the NIFA Risk Alert creates a factual dispute that is better left for trial. In *Bank of Am. Corp.*, however, "there was no speculation" about whether the defendants' conduct could violate the law because "courts in fact had found problems [with the conduct alleged in the complaint]." *Id.* Here, by contrast, no entity with the force of law has found Xunlei's conduct illegal, rendering Plaintiffs' allegations purely speculative. Moreover, the Second Circuit has consistently instructed courts that unresolved disputes of foreign law are to be settled by the Court, not the jury. *See Itar-Tass.*, 153 F.3d at 92; *see also Curley*, 153 F.3d at 13.[13]

### b. The Alleged Omissions

Plaintiffs allege three omissions during the Class Period: (1) the Oct. 2017 Press Release

---

[12] Although this dispute is construed in Plaintiff's favor for purposes of this motion, the opposite conclusion is at least equally as likely on the facts pleaded in the FAC. Just two weeks after Xunlei launched the Rewards Program, it posted on the Chinese version of its website, stating: "[t]here is no official trading platform" for OneCoins and "we do not encourage users" to participate in third-party platforms. (Pao Ex. C; *see also* FAC ¶ 46).

[13] Of course there may be circumstances where unresolved factual disputes underlie a foreign legal determination that should nonetheless be left for trial. *See de Fontbrune v. Wofsy*, 838 F.3d 992, 998–99 (9th Cir. 2016), *as amended on denial of reh'g and reh'g en banc* (Nov. 14, 2016). That is simply not the case here.

announcing the launch of the Rewards Program; (2) the Q3 2017 Press Release; and (3) statements made by Chen during the Q3 2017 Conf. Call in which he discusses the Rewards Program generally (FAC ¶¶ 42-43, 47-48, 49-50).   Plaintiffs believe all three of these statements are actionable omissions because anytime Xunlei, its subsidiary, or Chen publicly spoke about the Rewards Program and did not mention its illegality, they misled investors. (Pl.'s Opp., Dkt. 38, at 12).   Since the Rewards Program did not violate Chinese law, Xunlei clearly had no duty to say that it did. *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing."), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006). Consequently, Plaintiffs fail to plead an actionable omission.

### c.  The Alleged Misstatements

The FAC also alleges three misstatements: (1) the statement of Xunlei's subsidiary in Yicai Global on October 16, 2017 that the Rewards Program is not a disguised ICO and that OneCoins can only be used for Xunlei products; (2) Chen's statement in the Q3 Press Release that Xunlei does not "monetize" OneCoin, and (iii) Chen's statement in the Q3 2017 Conf. Call that Xunlei "follow[s] all the local regulations and laws." (FAC ¶¶ 44-45, 51-54).

Plaintiffs contend the Yicai Global article was misleading because OneCoin was a disguised ICO and because OneCoin use was not actually limited "to the exchange of Xunlei products." (FAC ¶ 45).  The statements in this article are not misleading because they are true. As already discussed, the Rewards Program was not a disguised ICO and Plaintiffs do not allege that Xunlei ever offered OneCoin in exchange for anything other than Xunlei affiliated products and services.  Nor do Plaintiffs allege that the trading of OneCoin on third-party platforms had even begun on the date the Yicai Global article was published— six days after the Rewards

Program launched. (*See id.* ¶¶ 34-40).

Chen's statement that Xunlei had "no plan to monetize" OneCoin was also not misleading. Plaintiffs believe this statement was false because "Xunlei had already monetized its cryptocurrency, by using it to purchase computing resources from OneThing Cloud users for which it would otherwise have to spend hard currency to obtain." (FAC ¶ 52). Chen's full statement, however, makes that clear:

> Okay, I see. The company has no plan to monetize over the coin at all. And as I said before, the crypto token is rewarded to users who volunteer in the OneThing reward program *to encourage users to share idle bandwidth storage and the CPU computing* for its leverage. That is volunteer program and is set up separate from the sales of the OneThing Cloud product itself.
>
> So, I'd like to just explain a little bit about the – about it. So, OneThing Cloud as a product is priced at a slightly lower the market, the competitive market for equivalent products that are offered by other companies. And so, after purchasing OneThing Cloud, the user has a option to enroll into a voluntary program and *to share their computing power and we rewarded it by this crypto token*. From the beginning we as company has no plan at all to monetize on this coin, and we certainly do not in the future.

(FAC ¶ 51) (emphasis added). Read in context, a reasonable investor would clearly have understood Chen's "no plan to monetize" statement to mean that Chen does not sell OneCoins or exchange them for a user's cash, but uses them only to "encourage users to share idle bandwidth storage and [ ] CPU computing." (*Id.*) This statement was true and consequently not misleading. Chen's statement that Xunlei "follow[s] all local laws and regulations" is similarly not misleading because Plaintiffs fail to plausibly allege it was not true. Since the Rewards Program was not illegal, these statements were not false or misleading, and Plaintiffs fail to plead a misstatement.

## B. Inference of Scienter

Even had the FAC adequately alleged a misstatement or omission, Plaintiffs' Section 10(b) claim would still fail because the FAC does not adequately allege scienter. "In order to plead

scienter adequately under the PSLRA, a plaintiff must plead with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation omitted).   The required state of mind is an intent "to deceive, manipulate, or defraud." *Id.*  While courts typically draw inferences in favor of plaintiffs, a securities fraud claim "will survive [dismissal] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Scienter can be established by alleging facts showing either (1) that the defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Id.*  Where a plaintiff alleges the latter, she must prove "conscious recklessness—i.e., a state of mind approximating actual intent." *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 175 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x 7 (2d Cir. 2016) (quoting *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation omitted).   Reckless conduct is "not merely a heightened form of negligence" *id.*; it is "highly unreasonable and represents an extreme departure from the standards of ordinary care." *In re Carter- Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).   "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation omitted).

Plaintiffs do not argue that Defendants had a motive and opportunity to defraud. Instead, they seek to cobble an inference of scienter together based on Xunlei and Chen's knowledge of the 2017 ICO Notice, Fei's statement that the Rewards Program was a disguised ICO, and Chen's statement that he was "work[ing] closely with the regulatory authorities in China." (FAC ¶ 53). The 2017 ICO Notice cannot support an inference of scienter because it was publicly available. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("[P]laintiffs cannot rely on information generally known or available to the public to support to support circumstantial scienter allegations."). Fei's termination and subsequent accusation of illegality also do not create an inference "approximating actual intent to defraud." Her statement failed to disclose any concealed fact suggesting illegality and at best, points to a difference of opinion regarding an unclear legal issue.[14] Moreover, Fei issued her statement *after* Xunlei announced it was terminating its business relationship with her. The "more compelling" inference to be drawn from this timing is not that Xunlei was retaliating against her, but that she was retaliating against Xunlei.

Chen's close relationship with Chinese regulatory authorities also does not suggest an intent to deceive or defraud. Plaintiffs do not allege that Xunlei ever concealed any part of how the Rewards Program operated. Plaintiffs cannot manufacture a scienter allegation with speculation that regulators must have informed Chen that the Rewards Program is illegal, particularly given their failure to plead that it was. *See generally Gabriel Capital, L.P. v. Natwest Finance, Inc.*, 137 F. Supp. 2d 251, 261 (S.D.N.Y. 2000). ("It is well established that plaintiffs cannot plead scienter based on speculation and conclusory allegations.").

## C. Loss Causation

---

[14] As noted *supra* Part II.A.1., legal experts have noted that the 2017 ICO Notice is not clear about what conduct it actually prohibits.

"Loss causation . . . is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). Loss causation is sufficiently alleged by "the existence of cause-in-fact on the ground that '(a) the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *BioScrip*, 95 F. Supp. 3d at 733. A corrective disclosure must "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

The Court need not reach loss causation here because Plaintiffs' failure to adequately plead scienter or a misstatement or omission is dispositive of the Section 10(b) claim. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 817 (S.D.N.Y. 2018); *see also In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 368 (S.D.N.Y. 2015), *aff'd* (Mar. 21, 2016) ("[S]ince loss causation is premised on the assumption that a misstatement or omission concealed something from the market. . . Plaintiffs cannot demonstrate loss causation where they have failed to establish any such misrepresentation."). Nonetheless, the Court notes that neither Fei's statement nor the NIFA Risk Alert can form the basis for the "corrective disclosure" or "materialization of the risk" that Plaintiffs allege because these statements fail to reveal any new facts not already known to the public. *See In re Omnicom*, 597 F.3d at 511–12 ("A negative [ ] characterization of previously disclosed facts does not constitute a corrective disclosure" sufficient to plead loss causation); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *31 (S.D.N.Y. May 10, 2012).

### III.   Claim under Section 20(a) against Individual Defendant Chen

An officer of a company may be held accountable for the company's misrepresentations

under Section 20(a) of the Exchange Act.   To plead a claim under Section 20(a), a plaintiff must

allege: (1) a primary violation of the Act by a controlled person; (2) control (direct or indirect) of

the primary violator by the defendant; and (3) that the controlling person was in some meaningful

sense a culpable participant in the primary violation.   *Janbay v. Canadian Solar, Inc., No. 10 CIV.*

*4430 RWS, 2012 WL 1080306, at \*17 (S.D.N.Y. Mar. 30, 2012).*   Since Plaintiffs fail to plead a

primary violation of the securities law, their Section 20(a) claim fails as well. *See ATSI Commc'ns,*

*Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007); *Schiro v. Cemex, S.A.B. de C.V.,* No.

18-CV-2352 (VEC), 2019 WL 3066487, at \*15 (S.D.N.Y. July 12, 2019).

## CONCLUSION

Defendants' motion to dismiss the FAC for failure to state a claim is GRANTED.   The

Clerk of the Court is directed to close the motion at Dkt. 32 and close the case.

Dated: New York, New York
        September _10_, 2019

SO ORDERED

PAUL A. CROTTY
United States District Judge